# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2009

Charles R. Fulbruge III
Clerk

No. 07-50670

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

RICARDO TIRADO-TIRADO

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, BENAVIDES, and STEWART, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Ricardo Tirado-Tirado ("Tirado-Tirado") was convicted of encouraging and inducing Rodrigo Garay-Ramirez ("Garay-Ramirez"), an alien, to enter the United States with knowledge or reckless disregard of the fact that such entry was unlawful in violation of 8 U.S.C. § 1324(a)(1)(A). Tirado-Tirado asserts that the introduction of a videotaped deposition of Garay-Ramirez at trial violated his rights under the Confrontation Clause of the Sixth Amendment because the government failed to show that Garay-Ramirez was unavailable for trial and Tirado-Tirado did not have a full and fair opportunity to cross examine Garay-Ramirez during the videotaped deposition. For the reasons stated below, we

VACATE the judgment and REMAND for new trial.

I.      Background

        A.      Efforts to Secure Garay-Ramirez's Presence at Trial

Garay-Ramirez's videotaped deposition was taken by the government and Tirado-Tirado's counsel on August 29, 2006. Garay-Ramirez was advised that the case would be tried at a future date and that he would be asked to come back and appear as a witness at trial. He was also asked to provide his contact information to his attorney. He was subsequently released and returned to Mexico.

On December 8, 2006, the district court set the first day of Tirado-Tirado's trial for February 20, 2007. The Customs and Border Protection officer assigned to the case, Raymon Rosado, attempted to contact Garay-Ramirez prior to trial using an address and telephone number provided by Garay-Ramirez's counsel. The telephone number did not work. On February 12, 2007, just eight days prior to trial, Rosado sent a letter to Garay-Ramirez using the address provided by Garay-Ramirez's counsel. The letter notified Garay-Ramirez of the pending trial date and location; requested that he appear and that he contact Rosado; provided him with information regarding the port of entry that he should use to enter the United States and who would meet him there; and stated that he would be reimbursed for his travel expenses. Rosado also spoke to Garay-Ramirez's brother, Feliciano, who said that Garay-Ramirez had no telephone at his home in Mexico and that he would attempt to relay the information to his brother. Rosado also questioned Feliciano about his role in bringing Garay-Ramirez into the United States.

On February 15, 2007, Rosado spoke to the owners of the vehicle seized from Tirado-Tirado and obtained the name of Tirado-Tirado's common-law wife in Hatch, New Mexico. Rosado obtained her telephone number from the

2

telephone directory. On February 16, Rosado reviewed the call log of the cellular telephone possessed by Tirado-Tirado at the time of his arrest. One of the calls was made to Western Union, and Rosado subpoened Western Union records for transactions made in Tirado-Tirado's name. Another call was made to Sergio Banuelos, the name on the resident alien card that Garay-Ramirez tried to use to enter the United States. However, these leads did not assist the government in locating Garay-Ramirez. Rosado also checked immigration and criminal records but was unable to locate any information regarding Garay-Ramirez's whereabouts.

## B.    Tirado-Tirado's Trial

On the first day of trial, Tirado-Tirado filed a motion to quash the video deposition on the basis that the government had failed to make sufficient efforts to secure Garay-Ramirez's presence at trial. The district court questioned whether a letter sent eight days before trial was calculated to obtain a response by the trial date and stated that the government should have begun its efforts sooner. The government conceded that "preferably a letter should have gone out several weeks before it did." Nevertheless, the court admitted the video deposition pursuant to 8 U.S.C. § 1324(d), which provides that "notwithstanding any provision of the Federal Rules of Evidence, the videotaped . . . deposition of a witness . . . who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for [transporting illegal aliens] if the witness was available for cross-examination and the deposition otherwise complies with the Federal Rules of Evidence."[1]

---

[1]This court has rejected the argument that the procedures established in § 1324(d) are unconstitutional, but has stated that the statute does not eliminate the requirement that the government establish the unavailability of a witness before the witness's deposition testimony

At trial, Customs and Border Protection officer Margarita Crespin testified that on August 14, 2006, she stopped a truck driven by Tirado-Tirado at the Pasa Del Norte checkpoint. Tirado-Tirado gave Crespin his resident alien card and that of his passenger. Tirado-Tirado's card appeared to be valid. However, the photograph on the passenger's card did not resemble the passenger. When Crespin questioned them about the passenger's card, both men avoided eye contact and looked straight ahead. They seemed uneasy and nervous, and Tirado-Tirado licked his lips repeatedly. Tirado-Tirado said the two men had been friends a long time, which Crespin found unusual as the passenger looked much younger than Tirado-Tirado. She referred the truck to secondary inspection with the notation "possible impostor."

William Sutlive, a Customs and Border Protection officer, testified that he interviewed Tirado-Tirado at secondary inspection. Sutlive testified that Tirado-Tirado was uncooperative, sullen, and angry. Tirado-Tirado refused to acknowledge whether he understood his *Miranda* rights.

Officer Rosado testified that he interviewed Garay-Ramirez, who told Rosado that Garay-Ramirez's brother, Feliciano, had made the arrangements for Garay-Ramirez to come into the United States. Rosado also testified about statements that Feliciano made to Rosado the week before trial, which was the first time that Rosado had spoken with Feliciano. Feliciano told Rosado that he had paid for a bus ticket for Garay-Ramirez to travel to Juarez and that Garay-Ramirez's brother-in-law, Chuy, had made the arrangements to bring Garay-Ramirez into the United States. Rosado stated that this account conflicted with Garay-Ramirez's statement to Rosado that Feliciano had made all of the

---

can be admitted at trial. *See United States v. Aguilar-Tamayo*, 300 F.3d 562, 565 (5th Cir. 2002), *cited by United States v. Calderon Lopez*, 268 F.App'x 279, 288–89 (5th Cir. 2008).

4

arrangements.

Customs and Border Patrol agent Pablo Castro testified that he arrested Tirado-Tirado in 2001 for alien transporting, which was charged as a misdemeanor. At the time of that arrest, Tirado-Tirado admitted that he had transported people before. Tirado-Tirado indicated that he did so because it was a far walk and that something could happen to them. However, Castro testified that the aliens paid Tirado-Tirado $1,000 each to transport them into the United States.

Garay-Ramirez's video deposition was played for the jury. Garay-Ramirez testified that Feliciano called him and told him to come to the United States. Garay-Ramirez testified that Feliciano told him to talk to a man whose brothers-in-law would pick him up. Garay-Ramirez took a bus to Juarez, where his aunt's brother-in-law, a man whose last name was Calderon, picked him up and took him to his house, where Garay-Ramirez stayed for two to three days. Two men, known to him as El Churro and El Perro, obtained an identification card for him. Feliciano called and told Garay-Ramirez to go to a cathedral, where he would be picked up.

Garay-Ramirez waited at the cathedral, where Tirado-Tirado came and picked him up. Garay-Ramirez testified that he believed Tirado-Tirado recognized him because Feliciano had instructed Garay-Ramirez to wear a white hat. They then drove to the border checkpoint. Before they arrived at the border checkpoint, Tirado-Tirado asked Garay-Ramirez for his identification card. Otherwise, Tirado-Tirado did not speak to Garay-Ramirez during the drive. Garay-Ramirez stated that he had never seen Tirado-Tirado before that day. Garay-Ramirez stated that he did not pay anyone to take him into the United States, and he did not know what arrangements were made on his behalf. He conceded that he was going to be released to return home in exchange for his

5

testimony.

Tirado-Tirado's counsel argued to the jury that his client was simply giving someone a ride without expectation of compensation and that there was no evidence that he was involved in a prearranged plan to bring Garay-Ramirez into the United States or that he knew Garay-Ramirez's entry was unlawful. In order to establish Tirado-Tirado's knowledge or reckless disregard of the fact that Garay-Ramirez's entry was unlawful, the government pointed out that Tirado-Tirado appeared nervous at inspection, that Tirado-Tirado falsely stated at inspection that he and Garay-Ramirez were longtime friends, and that Tirado-Tirado picked Garay-Ramirez up in front of the church, the prearranged meeting place, and drove directly to the border without speaking to him. The government also noted Tirado-Tirado's prior conviction for transporting aliens.

The jury found Tirado-Tirado guilty. The district court sentenced Tirado-Tirado to ten months in prison and a three-year term of supervised release. Tirado-Tirado filed a timely notice of appeal.

## II.   Standard of Review

This court reviews a Confrontation Clause challenge de novo. *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008). Such claims, however, are subject to harmless error review. *Id.*; *see also United States v. Jimenez*, 464 F.3d 555, 558 (5th Cir. 2006); *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004).

## III.   Whether There Was a Violation of the Confrontation Clause

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 53–54, 68 (2004), the Supreme Court held that the right to confrontation bars the "admission of testimonial statements of a witness who did

not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *See also United States v. Harper*, 527 F.3d 396, 401 (5th Cir. 2008); *United States v. Flores*, 286 F.App'x 206, 214 (5th Cir. 2008). There is no dispute that the playing of the videotaped deposition constituted the admission of testimonial statements of a witness who did not appear at trial. At issue in this case is whether Garay-Ramirez was "unavailable to testify" at Tirado-Tirado's trial, and whether Tirado-Tirado had a prior opportunity to cross-examine Garay-Ramirez.[2]

## A. Unavailability

A witness is "unavailable" for Confrontation Clause purposes if the "prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *Barber v. Page*, 390 U.S. 719, 724–725 (1968)), *overruled on other grounds by Crawford*, 541 U.S. 36.[3] "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* (quoting *California v. Green*, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring)). "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Roberts*, 448 U.S. at 74. "Because of the importance our constitutional tradition attaches to a defendant's right to confrontation, the 'good

---

[2]Tirado-Tirado appears to challenge the admission of the videotaped deposition solely on constitutional grounds, not on any independent admissibility requirement imposed by statute or the Federal Rules of Evidence.

[3]*Crawford* did not change the definition of "unavailability" for Confrontation Clause purposes; pre-*Crawford* cases on this point remain good law.

faith effort' requirement demands much more than a merely perfunctory effort by the government," but "[t]he inevitable question of precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases." *United States v. Allie*, 978 F.2d 1401, 1406, 1408 (5th Cir. 1992). The prosecution bears the burden of establishing that a witness is unavailable. *Roberts*, 448 U.S. at 74.[4]

The measures taken by the government in this case do not constitute "good faith" or "reasonable" efforts to secure the physical presence of Garay-Ramirez at trial. The government failed to make any concrete arrangements with Garay-Ramirez prior to his deportation, and it delayed attempting to contact him about making such arrangements until shortly before trial. Garay-Ramirez was not served with a subpoena or given any sort of written notice regarding the trial prior to being deported. He appears to have been only orally informed that his testimony would be required if the case went to trial. *Cf. United States v. Calderon Lopez*, 268 F.App'x 279, 289 (5th Cir. 2008) (finding that a government special agent made a good faith effort to secure the presence of four witnesses at trial sufficient to satisfy the Confrontation Clause by: (1) issuing subpoenas and letters to each witness translated into Spanish indicating the trial date and that the witness might be required to testify at trial prior to the witnesses' deportation; (2) providing explicit instructions in the letters for obtaining the necessary documents to enter the United States and providing each witness with

---

[4]This Court treats the Confrontation Clause unavailability inquiry as identical to the unavailability inquiry under Rule 804(a)(5) of the Federal Rules of Evidence, which defines a witness as being unavailable when he is "absent from the hearing and the proponent of [his] statement has been unable to procure [his] presence by process or other reasonable means." *See Calderon–Lopez*, 268 F.App'x at 288; *Aguilar-Tamayo*, 300 F.3d at 565 ("Unavailability must ordinarily also be established to satisfy the requirements of the Confrontation Clause.").

8

the travel distance to the local American Embassy from his respective place of residence, along with the addresses and telephone numbers for the Embassies; (3) informing each witness that the government would pay for the trip and reimburse the witness for any other incidental travel needed for the purpose of testifying; (4) providing one of the witnesses with a contact number; (5) making "several attempts to contact" another one of the witnesses in Mexico; and (6) remaining in contact with the two other witnesses and requesting Significant Public Benefit Paroles in order to facilitate their reentry into the United States); *Allie*, 978 F.2d at 1403, 1407 (finding that the government took reasonable measures to secure the presence of deported witnesses by: (1) giving the witnesses the option of remaining in the United States with work permits; (2) telling the witnesses about the payment of witness fees and travel cost reimbursements; (3) giving the witnesses a subpoena and a letter to facilitate their reentry into the United States after their depositions and prior to their deportation; (4) calling the witnesses in their home country; (5) prior to their deportation, getting the witnesses' repeated assurances that they would return; (6) apprising the border inspectors of the witnesses' expected arrival; and (7) issuing checks to be given to the witnesses upon their reentry into the United States).  Further, this oral notice only apprised Garay-Ramirez of the prospect that he would be required to return to testify in relatively vague and uncertain terms. *See United States v. Guadian-Salazar*, 824 F.2d 344, 346–47 (5th Cir. 1987) (stating that instructions to witnesses that in the event their testimony was needed, the government would "make provisions for you to legally enter the United States and to remain until the case is terminated," were ambiguous and contributed to "virtually assur[ing] the witnesses' absence").

The government did not make any effort to contact to Garay-Ramirez to make concrete arrangements for his attendance at trial until more than five

months after his deposition was taken, more than two months after the district court set the trial date, and only eight days before trial. This lack of vigilance on the part of the government is similar to that in *Guadian-Salazar*, in which the government made no effort to contact the witnesses in the intervening month before trial and conceded that it had not made a good faith effort to procure the availability of deported witnesses for trial. 824 F.2d at 346. By contrast, in *Allie* and *Calderon Lopez*, in which we found that the government took reasonable measures to secure the presence of deported witnesses, the government made efforts to remain in contact with the witnesses following their deportation.

The government's failure to keep Garay-Ramirez in the United States does not, as Tirado-Tirado asserts, *per se* demonstrate a lack of good faith by the government. *Allie*, 978 F.2d at 1407–08. Although "the government's good faith efforts to assure [a witness's] availability at trial should include efforts aimed at keeping the witness[ ] in the United States," as keeping a witness in the United States is often probably the best way to ensure that the witness will be present for trial, deporting a witness may still be consistent with "good faith" and "reasonable" efforts to procure the witnesses' availability at trial. *Id.* However, in this case, the government's actions do not meet that standard. The problem is not that officer Rosado failed to make a diligent effort to find Garay-Ramirez once he began the search (indeed, Rosado appears to have conducted a fairly exhaustive investigation of his whereabouts), but that those efforts were made at the last minute and followed a long period during which the government apparently made no effort to remain in contact with Garay-Ramirez.[5]

_____

[5]The record does not show that the government deliberately sought to make Garay-Ramirez unavailable for trial. However, "good faith" in the Confrontation Clause context is an objective standard that looks to the reasonableness of the government's efforts to secure the witness, not the subjective intent of the responsible government officials. Thus, showing that the government acted in good faith from a subjective perspective is necessary, but not

10

Attempting to remain in contact with Ramirez and make concrete arrangements with him to return for trial once the trial date had been set by the district judge, or at least seeking to contact him more than one week prior to trial, as the government concedes it should have done, would not have required significant government resources, and in fact might have saved the government from having to conduct a more exhaustive search as the trial date approached. The failure to make such minimal efforts demonstrates a lack of good faith on the part of the government, with the consequence that Garay-Ramirez was not "unavailable" for Confrontation Clause purposes.

## B.    Prior Opportunity to Cross Examine

Tirado-Tirado asserts that he did not have the opportunity to cross examine Garay-Ramirez regarding statements made the week before trial by Garay-Ramirez's brother, Feliciano, to officer Rosado regarding Feliciano's and other family members' involvement in smuggling operations. Feliciano stated that he paid for Garay-Ramirez's bus ticket to Juarez and that their brother-in-law Chuy was involved in the plan to bring Garay-Ramirez into the United States. Tirado-Tirado argues that Garay-Ramirez's desire to protect his family from criminal prosecution gave him an incentive to lie about Tirado-Tirado's role in the smuggling operation, and that he was prejudiced by not being able to cross-examine Garay-Ramirez about Feliciano's statements.

Although Tirado-Tirado was not able to cross-examine Garay-Ramirez concerning the specific statements made the week before trial by Feliciano, Garay-Ramirez testified during his deposition that his brother was responsible for arranging his trip into the United States and that other family members

---

sufficient, to establish good faith for the purposes of the unavailability inquiry. *See Roberts*, 448 U.S. at 74.

11

were involved in the plan. Feliciano's statements did not newly raise the prospect that Garay-Ramirez's family members were involved in the plan to bring Garay-Ramirez into the United States. Feliciano stated that he had played a more minor role in the plan than Garay-Ramirez had testified, and that Garay-Ramirez's brother-in-law, Chuy, had made all of the arrangements to bring Garay-Ramirez into the United States. This new evidence concerned only the relative extent of each family member's involvement. Tirado-Tirado had an opportunity to cross-examine Garay-Ramirez about his family's involvement and explore the possibility that Garay-Ramirez testified falsely in order to protect his family. *See Calderon–Lopez*, 268 F.App'x at 289–90 (rejecting argument that defendants did not have an opportunity to cross-examine a deported witnesses on the issue of hostage taking during a videotaped deposition when the government provided notice on the day of the deposition that a superseding indictment would be filed that might include that charge because "the defendants were nonetheless able to evaluate to what extent each deponent's testimony would implicate them with regard to a potential hostage taking count and cross-examine each witness on that issue").

The admission of Garay-Ramirez's videotaped deposition violated the Confrontation Clause because Garay-Ramirez was not "unavailable" for trial, but not because Tirado-Tirado did not have a full and fair opportunity to cross examine Garay-Ramirez.

## IV.  Whether the Error Was Harmless

A defendant convicted on the basis of evidence introduced in violation of the Confrontation Clause is entitled to a new trial unless the admission of that evidence constitutes harmless error, meaning that there is no reasonable possibility that the improperly admitted evidence might have contributed to the conviction. *Alvarado-Valdez*, 521 F.3d at 341 (citing *Chapman v. California*, 386

U.S. 18, 24 (1967)). The government bears the burden of establishing that the error is harmless beyond a reasonable doubt. *Id.* (*citing United States v. Akpan*, 407 F.3d 360, 377 (5th Cir. 2005)).

In this case, Tirado-Tirado was convicted of encouraging and inducing Garay-Ramirez to enter the United States with knowledge or in reckless disregard of the fact that such entry was unlawful under 8 U.S.C. § 1324(a)(1)(A). Tirado-Tirado does not dispute that he picked up Garay-Ramirez in Mexico and attempted to drive him into the United States, but Tirado-Tirado contends that he did not know, or act in reckless disregard of, the fact that Garay-Ramirez was not legally permitted to enter the United States. In its closing argument, the government argued that the jury could infer that Tirado-Tirado knew, or acted in reckless disregard of, the fact that Garay-Ramirez was not legally permitted to enter the United States because: (1) Tirado-Tirado and Garay-Ramirez appeared nervous when they were stopped at the border; (2) Tirado-Tirado lied about Garay-Ramirez being his longtime friend; and (3) Tirado-Tirado picked up Garay-Ramirez at a previously designated meeting place and drove directly to the border after picking up Garay-Ramirez without any discussion, indicating that Tirado-Tirado had prior knowledge of the plan to bring Garay-Ramirez into the United States illegally. Garay-Ramirez's testimony was the only evidence that Tirado-Tirado lied about Garay-Ramirez being his longtime friend and that Tirado-Tirado picked up Garay-Ramirez at a previously designated meeting place and drove directly to the border after picking up Garay-Ramirez without any discussion. In light of the emphasis that the government placed on this evidence to show that Tirado-Tirado knew, or acted in reckless disregard of, the fact that Garay-Ramirez was not legally permitted to enter the United States, there is a reasonable possibility that it might have contributed to Tirado-Tirado's conviction. *See Alvarado-Valdez*, 521

13

F.3d at 341 (finding that admission of testimony was not harmless error because of "the government's insistent reliance on the testimony in its closing argument"). As a result, the introduction of Garay-Ramirez's testimony was not harmless error.

The judgment is VACATED, and this matter is REMANDED for new trial.