# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2021

Lyle W. Cayce
Clerk

No. 19-50997

United States of America,

*Plaintiff—Appellee*,

*versus*

Esteban Gaspar-Felipe,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:18-CR-682-4

Before Jones, Costa, and Duncan, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Esteban Gaspar-Felipe appeals his convictions and sentence for his role in an alien smuggling operation during which an alien died. We affirm.

## I. Background

### A. Facts

In August 2018, a group of thirteen people, led by a guide nicknamed "Chivo," illegally entered the United States by crossing the Rio Grande. The group—which was reduced to eleven by the end of the trip—walked through the desert for nine nights until they reached a Texas highway. Chivo made a

No. 19-50997

call on his cell phone and, several hours later, two cars arrived to pick them up. A juvenile named David Morales was driving a Chrysler 300 sedan with Orlando Gomez (Orlando) in the front passenger seat. Alexandra Wharff was driving a Chevy pickup with her boyfriend, Carlos Gomez (Carlos), in the front passenger seat. Four of the aliens went into the Chrysler, and the other seven—including Chivo—went into the Chevy.

Shortly after that, early in the morning of September 7, 2018, Border Patrol agents observed these two vehicles traveling in tandem on the highway from Marathon, Texas. The agents initiated a traffic stop on the Chrysler, which pulled to the side of the road but then drove off quickly as the agents approached. The agents were unable to catch the fleeing vehicles, which were traveling at about 100 miles per hour even though it was still dark and intermittently raining, so they alerted other officials ahead. An officer deployed spike strips, which disabled the pickup, but the Chrysler evaded them. Carlos and the aliens exited the disabled truck and escaped into the brush, but Wharff remained in the truck and was arrested immediately.

Continuing its high-speed flight, the Chrysler traveled through school zone traffic, passed school buses, and avoided a second set of spike strips. During the pursuit, which reached a top speed of 115 miles per hour, police radio traffic included reports that an object was thrown from the Chrysler's window that might have been a firearm. A third spike-strip deployment was partly successful, but the Chrysler continued to drive on the rim of the flattened tire. Officers positioned their vehicles to try and force the Chrysler to detour away from an upcoming area of school traffic and morning congestion, but the Chrysler thwarted that attempt by driving against oncoming traffic. Officers then fired their rifles at the Chrysler, trying to disable the tires. After the Chrysler stopped, officers found that one of the aliens, Tomas Juan-Tomas, had been shot to death. The other occupants were captured and detained.

Meanwhile, after escaping the disabled pickup, Carlos took the aliens into hiding so he could complete delivery and receive his payment for transporting them. But Wharff provided information that led to Carlos's arrest, and Carlos then provided information that led to the arrest of appellant Esteban Gaspar-Felipe, the last of the aliens still in hiding. Cecilio Jimenez-Jimenez and Juan Juan-Sebastian, two of the aliens in the Chrysler, identified Gaspar-Felipe as Chivo, who guided their group from Mexico.

### B. Procedural History

A grand jury charged Wharff, Orlando, Carlos, and Gaspar-Felipe with two counts of transporting an illegal alien for the purpose of commercial advantage and private financial gain (Counts One and Two), and one count of transporting an illegal alien for the purpose of commercial advantage and private financial gain resulting in death (Count Three). Gaspar-Felipe was also charged with illegal reentry (Count Four). Although Gaspar-Felipe was willing to plead to Counts One, Two, and Four, he would not plead guilty to Count Three. Because the government would not offer a plea deal that excluded his guilty plea to Count Three, Gaspar-Felipe proceeded to trial.

The district court granted the government's motion to declare Jimenez-Jimenez and Juan-Sebastian unavailable material witnesses because they were removed to Guatemala after they provided videotaped depositions, and the government was unable to contact them to arrange for their returning to testify at Gaspar-Felipe's trial.

The jury found Gaspar-Felipe guilty as charged in Counts One, Two, and Four. For Count Three, the jury found Gaspar-Felipe guilty of transporting an illegal alien for commercial advantage and private financial gain, but it found—by answering a special interrogatory—that his offense did not result in Juan-Tomas's death.

A presentence report (PSR) determined Gaspar-Felipe's total offense level was 28, including a ten-level adjustment under United States Sentencing Guidelines § 2L1.1(b)(7)(D) because a person died during the smuggling venture. The PSR did not apply an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1 because Gaspar-Felipe put the government to its burden of proof at trial. Based on a criminal history category of I, the resulting advisory range was 78 to 97 months in prison.

Gaspar-Felipe objected to the PSR on various grounds, including the lack of an adjustment for acceptance of responsibility and the reliance on acquitted conduct, namely the death of Juan-Tomas. Alternatively, Gaspar-Felipe requested a downward variance because he was acquitted of Juan-Tomas's death, he had been willing to plead guilty to most of the counts on which he was convicted, and a variance was warranted by the relevant sentencing factors. The court overruled all of Gaspar-Felipe's objections. After hearing arguments, the court denied Gaspar-Felipe's motion for a downward variance and determined the advisory range was appropriate. Accordingly, the court imposed a total within-Guidelines term of 78 months in prison and three years of supervised release.

Gaspar-Felipe timely appealed.

## II. Discussion

Gaspar-Felipe's arguments fall into two groups: challenges to his convictions and challenges to his sentence. We address each group in turn.

### A. Challenges to Gaspar-Felipe's Convictions

### i. Confrontation Clause

Gaspar-Felipe argues he was convicted in violation of the Confrontation Clause, a claim we review *de novo. United States v. Buluc*, 930 F.3d 383, 387 (5th Cir. 2019).

No. 19-50997

The issue concerns two witnesses—Juan Juan-Sebastian and Cecilio Jimenez-Jimenez—who were among the aliens Gaspar-Felipe smuggled. Captured after the September 2018 car chase, both men were deposed and then returned to Guatemala. But the government failed to secure either man's presence at Gaspar-Felipe's June 2019 trial, and so it moved to have them declared unavailable. Gaspar-Felipe timely objected, claiming their absence would violate his Sixth Amendment right to confront the witnesses against him. The district court granted the government's motion and both men's videotaped depositions were played for the jury.[1]

The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST., amend. VI. This clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). It is undisputed that "the playing of [a] videotaped deposition [at trial] constitute[s] the admission of [a] testimonial statement[]," *United States v. Tirado-Tirado*, 563 F.3d 117, 122–23 (5th Cir. 2009), and that Gaspar-Felipe was able to cross-examine both Juan-Sebastian and Jimenez-Jimenez during their depositions.[2] Thus, Gaspar-Felipe's Confrontation Clause claim turns on whether the men were "unavailable."

"A witness is 'unavailable' for Confrontation Clause purposes if the 'prosecutorial authorities have made a *good-faith effort* to obtain his presence

---

[1] Generally, the men testified that they or their family members had made up-front payments to members of the smuggling ring to facilitate their entry into the United States. They also described the journey across the border and identified Gaspar-Felipe as the man who guided the group of aliens across the desert.

[2] His defense counsel cross-examined both witnesses at their depositions.

at trial.'" *Tirado-Tirado*, 563 F.3d at 123 (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford*, 541 U.S. 36).[3] "The lengths to which the government must go to produce a witness to establish the witness's unavailability is a question of reasonableness and the government need not make efforts that would be futile." *United States v. Aguilar-Tamayo*, 300 F.3d 562, 565 (5th Cir. 2002). To be sure, a "merely perfunctory effort" is not enough. *United States v. Allie*, 978 F.2d 1401, 1408 (5th Cir. 1992); *see also Aguilar-Tamayo*, 300 F.3d at 566 (government did not use "reasonable means" where it "stipulated that it took no steps to secure the presence of . . . witnesses"). But when the government takes "numerous steps to insure that deported witnesses w[ill] return for trial," it has likely made a good faith effort. *Aguilar-Tamayo*, 300 F.3d at 566 (discussing *Allie*, 978 F.2d 1401). Furthermore, "[t]he ultimate success or failure of [the government's] efforts is not dispositive," provided it "has employed reasonable measures to secure the witness' presence at trial." *Allie*, 978 F.2d at 1407 (quoting *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 418 (5th Cir. 1992); *see also Mechler v. Procunier*, 754 F.2d 1294, 1297 (5th Cir. 1985) (witness unavailable where "state demonstrated adequate, though unsuccessful, attempts to secure her presence"). "The prosecution bears the burden of establishing that a witness is unavailable." *Tirado-Tirado*, 563 F.3d at 123.

In this case, the government's efforts to secure Juan-Sebastian's and Jimenez-Jimenez's presence at trial began during their depositions. The government informed both men they might have to testify at a future trial, received their verbal assurances under oath that they would return to testify if summoned, and issued them formal trial subpoenas. They each were given a letter in Spanish (their native language) telling them where and how to

---

[3] "[P]re-*Crawford* cases on [unavailability] remain good law." *Tirado-Tirado*, 563 F.3d at 123 n.3.

present themselves at the border in the event their testimony was required. The witnesses were informed—during the deposition and in the letter—that any travel, lodging, or other expenses would be paid by the government.[4] Finally, the government obtained Juan-Sebastian's and Jimenez-Jimenez's contact information, including addresses and phone numbers in Guatemala.

Starting in December 2018, about a month after the men were returned to Guatemala, one of the officers working the case, Special Agent Joel Avalos, began trying to reestablish contact. Avalos tried to reach them by phone no fewer than nine times each over the six-month period from December 2018 to May 2019. Jimenez-Jimenez never answered Avalos's calls. Juan-Sebastian never personally answered, though individuals purporting to be his relatives did. One relative, who identified himself as Juan-Sebastian's father, provided an alternate number for him, which Avalos also called during subsequent unsuccessful attempts to reach Juan-Sebastian.

Gaspar-Felipe argues these efforts were insufficient. For instance, he notes the government did not offer Juan-Sebastian or Jimenez-Jimenez work permits that would have let them to remain in the United States until trial. He also claims he successfully contacted Jimenez-Jimenez via Jimenez-Jimenez's court-appointed attorney. As to the government's efforts themselves, Gaspar-Felipe emphasizes the government's purported failure to verify the witnesses' contact information, its reliance on phone calls, and its failure to advance travel funds. He further suggests the government

---

[4] For example, the letters stated that, should the men have to testify, "the necessary arrangements will be made for your transportation . . . by means of a prepaid ticket." They further explained that "the United States Attorney's Office will pay for your hotel and meals" and that "[w]hen the trial comes to an end, [that office] will also pay your expenses for your return trip home." The trial subpoenas also stated that "the United States Attorney's Office will provide assistance for travel arrangements."

should not have waited over a month after the witnesses' return to Guatemala to start trying to reestablish contact.

Gaspar-Felipe's arguments are unavailing. The fact that the government did not offer the witnesses work permits does not make its efforts to secure their presence at trial unreasonable. *See, e.g.*, *Tirado-Tirado*, 563 F.3d at 124–25 (explaining that "deporting a witness may still be consistent with 'good faith' and 'reasonable' efforts to procure the witnesses' availability at trial" (quoting *Allie*, 978 F.2d at 1408)). The government may choose in certain cases to offer work permits to removable aliens, *see Allie*, 978 F.2d at 1407, but not doing so does not automatically undermine the good faith of its other efforts.[5] Nor does the fact that one witness (Jimenez-Jimenez) was allegedly reached by his own attorney show that the government's efforts to contact Jimenez-Jimenez were unreasonable. Gaspar-Felipe cites no support for that proposition.

We are also unpersuaded by Gaspar-Felipe's argument that the government failed to verify Juan-Sebastian's and Jimenez-Jimenez's contact information before sending them back to Guatemala. The record shows otherwise. Jimenez-Jimenez's sworn deposition testimony was that he gave Avalos accurate contact information. "Such sworn statements . . . serve as a vital form of verification in our legal system." *United States v. Foster*, 753 F. App'x 307, 315 (5th Cir. 2018) (per curiam) (Higginson, J., dissenting) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). Additionally, the Spanish-language letters given to both men state they had "agreed to provide [the

---

[5] *See Aguilar-Tamayo*, 300 F.3d at 566 ("We do not suggest that it is necessary for the government to take all of the steps referenced in *Allie*"—such as offering work permits—"to establish that it acted reasonably to secure a witness' presence"); *United States v. Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (unpublished) (government acted reasonably without offering work permits to witnesses who were deported).

government] with [their] new address and phone number" in the event there were "any changes for any reasons."[6]

Similarly unpersuasive is Gaspar-Felipe's argument that the government waited too long before contacting Juan-Sebastian and Jimenez-Jimenez. To be sure, a lengthy delay can influence our assessment of good faith. *See, e.g.*, *Tirado-Tirado*, 563 F.3d at 125 (finding a "long period during which the government . . . made no effort to remain in contact with [a witness]" showed "a lack of good faith"). But here the government first reached out to the witnesses just over a month after their return to Guatemala. To support his argument that this delay impugns the government's good faith, Gaspar-Felipe cites only our unpublished decision in *Foster*, 753 F. App'x at 312. But *Foster* is not precedential; and even if it were, it is distinguishable. The delay criticized there was "over three months," *ibid.*,[7] three times longer than the period here. *Cf. Tirado-Tirado*, 563 F.3d at 124 (government lacked good faith, in part due to a delay of "more than five months after [the witness's] deposition was taken"). So, we reject Gaspar-Felipe's argument that Avalos's roughly one-month delay in reaching out to the witnesses calls the government's good faith into doubt.

To sum up: Under the Confrontation Clause, the government must undertake reasonable efforts to secure the attendance of a deported witness at trial. *Tirado-Tirado*, 563 F.3d at 123. It did so here.

---

[6] *Cf. Tirado-Tirado*, 563 F.3d at 123 (government acted unreasonably when it "failed to make any concrete arrangements with [the witness] prior to his deportation" and did not "serve[] [the witness] with a subpoena" or provide "any sort of written notice regarding the trial prior to [the witness's deportation]").

[7] Moreover, the *Foster* panel was divided on this point. *See* 753 F. App'x at 315 (Higginson, J., dissenting) ("[T]he three-and-a-half months that elapsed between the witnesses' depositions and the government's first attempts to contact them was not an unreasonably long period of time.").

### *ii. Jury Instructions*

Gaspar-Felipe next challenges the jury instructions. We afford the trial court substantial latitude regarding jury instructions and review a challenge to them for abuse of discretion. *United States v. Daniel*, 933 F.3d 370, 379 (5th Cir. 2019). In doing so, we examine "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *Ibid.* (internal quotation marks and citation omitted).

Gaspar-Felipe was convicted on three counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii), which prohibits the transportation or moving, or the attempt to transport or move, of an illegal alien within the United States. The maximum prison term doubles from five to ten years if "the offense was done for the purpose of commercial advantage or private financial gain." § 1324(a)(1)(B)(i), (ii). "Because § 1324(a)(1)(B)(i) increases the applicable statutory maximum sentence, it must be found by a jury beyond a reasonable doubt." *United States v. Ruiz-Hernandez*, 890 F.3d 202, 210 (5th Cir. 2018).

As to those counts, the jury instructions included the following definitions:

> The term "commercial advantage" means that the defendant participated in an alien smuggling venture and that members of that venture received or negotiated payment in return for the transportation or movement of the aliens. The government need not prove that the defendant was going to directly financially benefit from his part in the venture.

> The term "private financial gain" means any monetary benefit obtained by the defendant for his conduct, whether conferred directly or indirectly. It includes a promise to pay money in the future.

At trial, Gaspar-Felipe objected to the second sentence in the "commercial advantage" definition as overly broad, but his objection was overruled. Gaspar-Felipe repeats this challenge on appeal. He contends the sentence implied that proof of any smuggler's financial gain from the venture also proved Gaspar-Felipe had the requisite intent to profit. Because there was no direct evidence Gaspar-Felipe sought to profit, he contends that, but for the erroneous instruction, he would not have been convicted.

We disagree. Under our precedent, the challenged instruction correctly stated the law. In *United States v. Garcia*, 883 F.3d 570 (5th Cir. 2018), we addressed a defendant's conviction for bringing unlawful aliens into the United States "for the purpose of commercial advantage or private financial gain," in violation of § 1324(a)(2)(B)(ii). *Id.* at 571. These terms denote a "financial-purpose element"—namely, that a defendant "must seek to profit or otherwise secure some economic benefit from her smuggling endeavor . . . beyond that of a pure reimbursement." *Id.* at 573–74 (citing *United States v. Zheng*, 306 F.3d 1080, 1085–86 (11th Cir. 2002)). To show this financial purpose, however, "the Government need not prove an actual payment or even an agreement to pay." *Id.* at 575 (cleaned up) (quoting *United States v. Kim*, 435 F.3d 182, 185 (2d Cir. 2006) (per curiam)). Instead, the jury could infer the defendant's financial motive from circumstantial evidence, such as (1) the defendant's lack of familial connection with the aliens; (2) the high level of planning and coordination in the operation; and (3) the grave risk of legal consequences to the defendant. *Id.* at 576.

Even absent proof of direct payment to the defendant, *Garcia* supports the proposition that § 1324's financial-purpose element may be proven through circumstantial evidence that someone in the operation would be paid and, consequently, that the defendant would receive some of that payment. *See id.* at 575–77. Our cases following *Garcia* confirm that. For instance, in *Ruiz-Hernandez*, 890 F.3d at 210, we held that a jury could infer the requisite

financial purpose in § 1342(a)(1)(B)(i) from, *inter alia*, "evidence that others in the same smuggling operation had received or would receive money."[8]

Applying *Garcia* and these other cases here, the government was not required to prove that Gaspar-Felipe directly received payments for transporting the illegal aliens. Instead, it could prove the financial-purpose element with circumstantial evidence, such as the fact that the illegal aliens had paid or would pay someone in the operation. Viewed in that light, the challenged instruction's statement that "[t]he government need not prove that the defendant was going to directly financially benefit from his part in the venture" accurately stated the law. Accordingly, the district court did not abuse its discretion by including that statement in the jury instructions. *See Daniel*, 933 F.3d at 379.

### iii. Sufficiency of the Evidence

Finally, Gaspar-Felipe contests the sufficiency of the evidence. In assessing that challenge, we "view[] all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict." *United States v. Moser*, 123 F.3d 813, 819 (5th Cir. 1997).  The government may prove its case by direct or circumstantial evidence, and "the jury is free to choose among reasonable constructions of the evidence." *United States v. Mitchell*, 484 F.3d

---

[8] *See also United States v. Green*, 777 F. App'x 742, 743 (5th Cir. 2019) (per curiam) (holding, "notwithstanding the absence of direct evidence of financial motive," the evidence was sufficient because "[j]urors could reasonably infer both that Green did not previously know the individuals being smuggled and that others in the same smuggling operation had received or would receive money for their efforts"); *United States v. Allende-Garcia*, 407 F. App'x 829, 833-34 (5th Cir. 2011) (agreeing with two unpublished cases from this court and published cases from other circuits that there was sufficient evidence to support the financial-purpose element of § 1324(a)(1)(B)(i) when "there was evidence that the defendant was working with a smuggling network and that someone in the network had received or would receive money").

762, 768 (5th Cir. 2007) (internal quotation marks and citation omitted). Determining "[t]he weight and credibility of the evidence [is] the sole province of the jury." *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007). The ultimate question on appeal is "whether [the jury] made a rational decision to convict or acquit." *United States v. Burton*, 126 F.3d 666, 677 (5th Cir. 1997) (internal quotation marks and citation omitted).[9]

To convict Gaspar-Felipe on the transportation counts, the jury had to find beyond a reasonable doubt that (1) an alien illegally entered or remained in the United States; (2) Gaspar-Felipe transported the alien within the United States intending to further that unlawful purpose; and (3) Gaspar-Felipe knew or recklessly disregarded the fact that the alien was illegally in the United States. 8 U.S.C. § 1324(a)(1)(A)(ii); *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002). To convict Gaspar-Felipe of the financial-purpose element, the jury had to find beyond a reasonable doubt that he acted for the purpose of commercial advantage or private financial gain. § 1324(a)(1)(B)(i); *Ruiz-Hernandez*, 890 F.3d at 210. On appeal, Gaspar-Felipe challenges only the transportation and financial-purpose elements. These challenges lack merit.

As to the transportation counts, Gaspar-Felipe attacks the credibility of three witnesses (Juan-Sebastian, Jimenez-Jimenez, and Carlos) who identified him as the person who guided the aliens across the Rio Grande,

---

[9] While the parties agree that Gaspar-Felipe preserved his sufficiency challenge, we are not so sure. Although Gaspar-Felipe unsuccessfully moved for acquittal on this basis at the close of the government's case, he called a rebuttal witness before resting his case. He did not renew his acquittal motion at that time. That likely means plain error review applies. *See United States v. Smith*, 878 F.3d 498, 502–03 (5th Cir. 2017). And the parties cannot waive the standard of review. *See United States v. Vasquez*, 899 F.3d 363, 380 (5th Cir. 2018) (citation omitted). We need not address this issue, however, because Gaspar-Felipe's challenge would fail regardless.

through the south Texas desert, and to the rendezvous point in Texas. On sufficiency of the evidence review, however, "[w]e do not make credibility determinations." *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994). Those are "the sole province of the jury." *Parker*, 505 F.3d at 331. Moreover, Gaspar-Felipe and his co-defendants launched similar credibility attacks on those witnesses during cross-examination. The jury was free to credit Gaspar-Felipe or the witnesses against him; it chose the latter.

Gaspar-Felipe's attack on the financial-purpose evidence fares no better. He claims the evidence fails to show he intended to profit from the venture. But he admits that two witnesses (Jimenez-Jimenez and Juan-Sebastian) testified that their family members paid people to smuggle them into the United States. Furthermore, the witnesses also testified their families were supposed to pay more money once they reached their destinations. Finally, there was testimony that one of the groups was to be paid "[a] thousand each person" for transporting the aliens into the United States. Under our cases, Gaspar-Felipe's financial purpose could be proven by this circumstantial evidence that the illegal aliens had paid or would pay someone in Gaspar-Felipe's operation and that Gaspar-Felipe would thus receive some of that payment for his role in the venture. *See Garcia*, 883 F.3d at 575–77; *Ruiz-Hernandez*, 890 F.3d at 210.

## B. Challenges to Gaspar-Felipe's Sentence

We turn next to Gaspar-Felipe's challenges to his sentence.

### i. Acceptance of Responsibility

Gaspar-Felipe first claims he was entitled to a downward adjustment for acceptance of responsibility. "We review a district court's interpretation or application of the [Sentencing] Guidelines *de novo* and its factual findings for clear error." *United States v. Cortez-Gonzalez*, 929 F.3d 200, 203 (5th Cir. 2019) (citation omitted).

No. 19-50997

Under the Sentencing Guidelines, a defendant's offense level is lowered two levels if he "clearly demonstrates acceptance of responsibility for his offense." U.S. Sent'g Guidelines Manual § 3E1.1(a) (U.S. Sent'g Comm'n 2018). But "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* cmt. app. n. 2.

Gaspar-Felipe was not entitled to this adjustment because he put the government to its burden of proof at trial. Though offered a plea bargain, he refused to accept it because the government insisted he plead guilty to Count Three (transportation of an alien resulting in a death). He refused. As his counsel explained at a pretrial status hearing, while Gaspar-Felipe was "willing to plead [guilty] to Counts 1, 2, or 4 . . . the government is refusing to allow him to plead to those counts [without also pleading guilty to Count 3] . . . and therefore, we will proceed to trial on all [counts]." Gaspar-Felipe went on to contest his guilt on three of the four charges.

Gaspar-Felipe argues he merited the adjustment because he went to trial only to contest his responsibility for Juan-Tomas's death. He points to Guidelines commentary that "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility . . . even though he [proceeds] to a trial." U.S.S.G. § 3E1.1(a) cmt. app. n. 2. An example is a defendant who "goes to trial to assert and preserve issues that do not relate to factual guilt." *Id.* Such a defendant's acceptance of responsibility "will be based primarily upon pre-trial statements and conduct." *Id.*

This argument fails. While Gaspar-Felipe expressed before trial willingness to plead guilty to Counts One, Two, and Four, he did not actually do so. Nothing stopped him from pleading guilty to those charges and going to trial only on Count Three. Instead, he went to trial on all counts and "put

15

No. 19-50997

the government to its burden of proof by denying the essential factual elements of [his] guilt." U.S.S.G. § 3E1.1(a), cmt. app. n. 2.

### ii. Death Enhancement

Gaspar-Felipe next contends he did not merit a ten-level enhancement to account for the death of one of the aliens. We disagree.

The Guidelines authorize a ten-level enhancement "[i]f any person died" in the course of smuggling, transporting, or harboring an unlawful alien. U.S.S.G. § 2L1.1(b)(7)(D). Gaspar-Felipe's PSR recommended this increase because "[Juan-Tomas] suffered death after being shot in the chest . . . by law enforcement." Gaspar-Felipe objected, arguing the enhancement was unwarranted because he had been "acquitted by the jury of causing the death of . . . Juan-Tomas."[10] The district court overruled his objection, finding Juan-Tomas's death was "reasonably foreseeable" in light of "the risk [inherent] in the offense."

On appeal, Gaspar-Felipe principally[11] argues it was "not reasonably foreseeable that [his] agreement to guide individuals into the United States would lead to a high-speed pursuit by law enforcement nor to [Juan-Tomas's]

---

[10] As noted *supra*, although the jury found Gaspar-Felipe guilty on Count Three—transportation of an alien resulting in a death—it answered in the negative a special interrogatory asking whether the jury found beyond a reasonable doubt that Gaspar-Felipe was responsible for Juan-Tomas's death.

[11] His argument that the Constitution bars considering acquitted conduct during sentencing is foreclosed by Supreme Court precedent. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam). And we have repeatedly rejected his follow-up argument that *Watts* is no longer good law. *See United States v. Farias*, 469 F.3d 393, 399 (5th Cir. 2006); *United States v. Preston*, 544 F. App'x 527, 528 (5th Cir. 2013); *United States v. Cabrera-Rangel*, 730 F. App'x 227, 228 (5th Cir. 2018) (per curiam).

death." He thus contends the government failed to prove facts necessary to sustain the enhancement.[12] We disagree.

To apply § 2L1.1(b)(7)(D) in our circuit, the government need show only that the defendant's alien-smuggling conduct was a but-for cause of someone's death. *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019); *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014). This is "not a difficult burden to meet." *Ramos-Delgado*, 763 F.3d at 402. It "requires the government to show merely 'that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct.'" *Salinas*, 918 F.3d at 466 (quoting *Burrage v. United States*, 571 U.S. 204, 211 (2014)). Even when many factors converge to cause a result, "one of those single factors will still be considered a but-for cause so long as the result would not have occurred in its absence." *Ruiz-Hernandez*, 890 F.3d at 212–13. In *Ramos-Delgado*, we vividly illustrated the breadth of this concept:

> [I]f . . . defendants' actions had merely sprained [a person's] hand, making him go to the hospital, and the hospital exploded from a gas leak, the defendants' actions would still have been a but-for cause of [the person's] death. But for his sprained hand the [person] would not have gone to the hospital.

763 F.3d at 402.

An even more direct causal chain exists here. Absent Gaspar-Felipe's guiding Juan-Tomas from Mexico to the rendezvous point in Texas, Juan-Tomas would have not found himself in the Chrysler where he was killed by

---

[12] *See United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010) ("The government must prove sentencing enhancements by a preponderance of the evidence."); *see also United States v. Barfield*, 941 F.3d 757, 762 (5th Cir. 2019) ("Like all factual findings used in sentencing, relevant conduct must be proven by a preponderance of the relevant and sufficiently reliable evidence.") (cleaned up).

police firing at the fleeing car. The thread from Juan-Tomas's death to Gaspar-Felipe's criminal conduct stretches backwards in an unbroken line.

The district court held Juan-Tomas's death was a foreseeable consequence of Gaspar-Felipe's conduct. But foreseeability is a hallmark of proximate cause,[13] which is not required to apply § 2L1.1(b)(7)(D) in our circuit. So we need not decide whether the court erred in finding Juan-Tomas's death was proximately caused by Gaspar-Felipe. "[W]e may affirm an enhancement on any ground supported by the record," *Salinas*, 918 F.3d at 465, and the record easily shows Gaspar-Felipe's conduct was a but-for cause of Juan-Tomas's death.

### iii. Procedural and Substantive Unreasonableness

Lastly, Gaspar-Felipe argues his sentence was procedurally and substantively unreasonable. We engage in a bifurcated review. *United States v. Gomez*, 905 F.3d 347, 351 (5th Cir. 2018). First, we ensure the district court committed no significant procedural error. *Ibid.* Second, if there was no procedural error, we review the substantive reasonableness of the sentence for abuse of discretion. *Ibid.*

Gaspar-Felipe argues the district court procedurally erred by failing to sufficiently explain its sentence and also by failing to consider the disparity between his sentence and the much lower sentences of his co-defendants. We disagree. A within-Guidelines sentence like Gaspar-Felipe's requires "little

---

[13] *See*, *e.g.*, *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. Unit B June 1981) ("Proximate cause is defined in terms of foreseeability."); *see also CSX Transp., Inc. v. McBride*, 564 U.S. 685, 717 (2011) (Roberts, C.J., dissenting) ("[F]oreseeability has, after all, long been an aspect of proximate cause."); DAN B. DOBBS ET AL., THE LAW OF TORTS § 198 (2d ed.) (Proximate cause means that an individual is responsible for "harms he foreseeably risked by his negligent conduct . . . to the class of persons he put at risk by that conduct.").

explanation." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005). The record shows that, in giving Gaspar-Felipe a bottom-of-the-Guidelines sentence of 78 months, the court properly considered the evidence, the PSR, the parties' written and oral submissions, and the 18 U.S.C. § 3553(a) factors. Furthermore, the court also accepted the government's arguments, supported by the evidence, that Gaspar-Felipe was not similarly situated to his co-defendants, due, for instance, to their cooperating with the prosecution and to Gaspar-Felipe's fleeing from law enforcement and leaving two of the aliens behind in the south Texas desert. The district court was therefore not required to avoid sentencing disparities between them. *See United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

Gaspar-Felipe's substantive attack on his sentence is similarly unavailing. "[A] sentence within a properly calculated Guideline range is presumptively reasonable." *United States v. Douglas*, 957 F.3d 602, 609 (5th Cir. 2020) (per curiam) (quoting *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir. 2006)). Gaspar-Felipe offers only a general, conclusory argument that the district court should have granted him a downward variance. He has therefore failed to rebut the presumption of reasonableness. *See ibid.*

## III. Conclusion

Gaspar-Felipe's convictions and sentence are AFFIRMED.